The plaintiff was the owner of a sloop called the Farmer'sDaughter. The sloop was employed by Moses Jones, owner of the schooner New Bern, then bound on a voyage from New Bern to New York, to carry from New Bern to Ocracoke Bar and there deliver to the schooner a part of her cargo, consisting principally of Indian corn, which the schooner was unable to carry over the shoal near Ocracoke Inlet called the Swash. The defendant was a passenger in the schooner, and as such entitled to carry his chest or trunk from Ocracoke to New York free of freight. The sloop received on board the lighter a load which he was hired to carry. It was not a full load for her, and she used no shifting boards. The defendant's trunk intended to accompany him on the voyage to New York was also put on board the sloop or lighter to be carried down to the schooner; and for the freight of this to the bar it does not appear whether there was or was not to be any charge. In this trunk, besides his apparel, the defendant had $545 in cash and bank notes. While the sloop was on her way down the river a sudden flaw of wind careened her much on her side. The corn shifted over to leeward, and in consequence of this shifting of the cargo she upset and sunk. Had shifting boards been used, the misfortune would not have happened. Shifting boards is the name for a rough partition of plank made in the hold of a vessel to prevent a cargo from rolling or shifting over from windward to leeward side. They are well known to all persons concerned in navigation, and are almost universally used by vessels which go to sea with cargoes and corn. It has never been the practice for lighters to Ocracoke to use them, whether with a full cargo or only with a part of a cargo. These generally carry a full cargo, and with a full cargo shifting boards are unnecessary. *Page 309 
The captain of the lighter, admitted to be a man of skill and experience, testified that he should have deemed it proper to put up shifting boards, and would have used them had he known when the lading commenced that she was to take less than a full cargo. It was testified that this case was the first accident of the kind known to have (408) happened in the river. The plaintiff, after his lighter was thus sunk, at the expiration of _____, caused her to be raised; and by thus raising her enabled the defendant, who was present during the process, to recover his trunk and its contents. The plaintiff, deeming this a case of general average or salvage, claims from the defendant a contribution to this expense proportioned to the rate which the money and the bank notes of the defendant thus saved bear to the value of the lighter and cargo thus saved.
This action cannot be supported on the ground of general average, because the rule of the maritime law upon which such claim is founded renders it indispensable that the goods should be thrown overboard to lighten a ship, in which case the loss incurred for the benefit of all shall be made good by the contribution of all. It is not sufficient even that the goods are washed overboard by the agitation of the sea, or destroyed by tempest or lightning; they must be thrown overboard by the direct agency of man for the purpose of easing the vessel in a moment of peril, and thereby increasing the chance of her preservation and that of the residue of the cargo.
The plaintiff claims from the defendant a proportionate part of the expense of raising the vessel and cargo, but such claim it is impossible to fix on the principle of a general average, because all were involved in the same common calamity, and no portion was sacrificed for the safety of the rest. The cases where the expense incurred in relation to goods have become the subject of a general contribution bear no analogy to the present one. A ship may sustain damage in a storm which cannot be repaired without unlading the goods, and as all are interested that the voyage should be continued, the expense of such unlading should be borne by the owners of the goods. Yet if sails are blown away, or masts or cables broken, the owner alone must bear the loss. The defendant's goods in this case were not saved, nor was the vessel raised, with any view to prosecute the voyage; that was necessarily ended by the oversetting of the vessel and the consequent injury to the cargo. (409) But the decisive grounds on which this claim must be rejected, and which is also an answer to the claim for salvage, is that the damage and consequent expense proceeded from the neglect of the owner himself. It was his duty not only to have provided a sufficient vessel at the commencement of the voyage, furnished with whatever was necessary to *Page 310 
convey her cargo in safety through an uncertain navigation, but to maintain her in a proper condition throughout the whole voyage.
The neglect of providing shifting boards where the cargo of grain was incomplete is not to be excused; the necessity of them is admitted by the captain, and is obvious to every person. It can scarcely be doubted that if they had been provided the vessel would not have overset by a sudden flaw of wind. It is certainly a matter of surprise that no accident of the kind has happened before, and can only be accounted for by supposing that a continual vigilance has been exercised to meet the approach of sudden flaws of wind, and by taking in sail before they strike the vessel. But the general neglect of ordinary precaution cannot excuse him who has thereby occasioned a loss to another's property; and no reason can be urged why the shipper of goods or a passenger should be made liable, in any shape, towards the performance of a duty incumbent on the owner. This would be to place him in a more unfavorable situation even than an insurer on the vessel, who is not liable on the policy for the vessel, nor even for goods shipped in the vessel by a person no way interested in her, if she has any deficiency in any one article necessary for safe and secure navigation.
NOTE. — On the question of average, see Ferguson v. Fitt, 2 N.C. 230.
(410)